**Kathleen J. PETERS, Executrix of the Estate of Michael C. Peters, Deceased**

**v.**

**UNITED STATES of America Federal Aviation Administration.**

Civ. A. No. 82–4803.

United States District Court, E.D. Pennsylvania.

Oct. 26, 1984.

---

4. The Court finds it unnecessary to decide the     validity of the claimed marriage.

Kathleen L. Daerr-Bannon, Daerr-Bannon & Kolber, Philadelphia, Pa., for plaintiff.

Susan M.H. Gillett, Torts Branch, Civil Litigation Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## FINDINGS OF FACT

KATZ, District Judge.

1. This is an action brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, et seq., to recover damages for the death of Michael C. Peters in an airplane crash near Locust Grove, Virginia at approximately 7:08 P.M. EST on November 25, 1979, while Mr. Peters was flying from the Washington, D.C. area to Lynchburg, Virginia.

2. This action has been brought by Kathleen J. Peters, Mr. Peter's widow and the personal representative of his estate.

3. At the time of his death, Mr. Peters, age 42, held a valid, single engine, private pilot license issued by the FAA. This li-

cense permitted him to operate single engine aircraft.

4. Mr. Peters was an experienced pilot. He had approximately 600 hours of flight time. He had flown in the D.C. area and the Lynchburg, Virginia area before.

5. On November 25, 1979, Mr. Peters was qualified to undertake a night cross-country flight in visual meteorological conditions in a single engine aircraft from College Park, Maryland to Lynchburg, Virginia.

6. Mr. Peters was not IFR (instrument flight rules) qualified. He was, therefore, not allowed to fly in instrument meteorological conditions, which exist when there is a "ceiling" of less than 1000 feet and/or visibility of less than three miles. A ceiling exists at the altitude at which the sky is described as "overcast" or at which cloud cover is described as "broken." Conditions are broken when clouds cover three-fifths to nine-tenths of the sky. Conditions are scattered when clouds cover one-tenth to less than one-half of the sky. The sky is overcast when more than nine-tenths is covered with clouds.

7. Mr. Peters was a VFR (visual flight rules) pilot. He was qualified to fly whenever the ceiling was 1000 feet or higher and visibility was three miles or more.

8. Marginal VFR conditions exist when the ceiling is between 1000 and 3000 feet and/or visibility is between three and five miles.

9. At the time of the accident, Mr. Peters was flying N7650D, a small single engine airplane known as a Piper "Tri-Pacer." Mr. Peters had purchased the plane in 1972.

10. At the time of the accident, Mr. Peters was flying from College Park, Maryland to Lynchburg, Virginia in order to attend a business meeting in Lynchburg at 8:15 A.M. on November 26, 1979.

11. Mr. Peters was not suffering from any mental or physical condition which contributed in any way to the accident.

12. N7650D was airworthy on the date of the crash. There is no evidence that mechanical failure contributed in any way to the accident.

13. The aircraft was equipped with navigation and communications equipment including a transponder. A transponder is equipment which enables air traffic control radar facilities to locate an aircraft. The aircraft did not have a DME, distance measuring equipment, optional equipment which permits the pilot to measure his distance from a navigational aid on the ground.

14. A VOR is a ground-based electronic navigation aid which transmits very high frequency navigation signals for 360 degrees.

15. A flight service station (FSS) is an FAA air traffic facility which provides services to airmen, including weather briefings to pilots.

16. Before starting his trip on November 25, 1979, Mr. Peters called flight service stations twice, once in the morning and once in the early part of the afternoon. The purpose of both calls was to obtain weather information. There is no record of what information the decedent received during these two conversations.

17. Mr. Peters flew from Doylestown, Pennsylvania to College Park, Maryland in the afternoon of November 25, 1979.

18. At 6:07 P.M. EST, Mr. Peters placed a telephone call to the Flight Service Station in Leesburg, Virginia, the nearest such facility to College Park, Maryland. He spoke to Marquette Bradley, a flight service station specialist. Mr. Bradley was responsible for briefing pilots on weather information. The conversation lasted until 6:09 P.M. EST. Their conversation was taped.

19. Mr. Bradley began to give Mr. Peters the latest Lynchburg weather. The decedent then interrupted Mr. Bradley's briefing to ask about the "dry bulb dewpoint spread" for Lynchburg. Mr. Bradley told Mr. Peters: "Sure ah temperature is six seven dewpoint six three."

The dry bulb dewpoint spread indicates the likelihood of fog. Decedent asked the briefer whether any fog was predicted "down there."

20. At this point in their conversation, Mr. Bradley told Mr. Peters that the forecast after nine p.m. local time was for "ceiling of fourteen hundred overcast, three miles light rain and fog but a variable ceiling of five hundred broken one mile rain and fog with a chance of thunderstorms. Mr. Peters responded to this by stating: "O'boy I think we'd better get down there quick."

21. The conditions forecast for Lynchburg after 9 P.M. were IFR conditions in which Mr. Peters was not authorized to fly.

22. A flight from College Park to Lynchburg in a Piper Tri-Pacer would take between one and two hours.

23. Mr. Bradley then informed Mr. Peters that the forecast for before 9 P.M. was for a ceiling of three thousand broken with occasional visibility of three miles and light rain showers. These were marginal VFR conditions. If visibility slipped below three miles, conditions would have been I.F.R.

24. Mr. Peters next statement was: "O.K. that doesn't sound too bad." At this point, decedent asked Mr. Bradley for a frequency to enable Mr. Peters to obtain clearance to penetrate a restricted area around Washington, D.C. Mr. Bradley provided the appropriate frequency. Mr. Peters then terminated the conversation.

25. It was Mr. Bradley's practice in briefing pilots to answer the pilot's specific questions before gathering information about the pilot's trip and providing a complete weather briefing.

26. Charlottesville, Virginia is between College Park, Maryland and Lynchburg, Virginia. Mr. Bradley did not report to Mr. Peters surface weather observations taken at the Charlottesville Airport at 4:46 P.M. and 5:54 P.M. EST.

27. The Charlottesville weather observations showed the existence of marginal VFR conditions. The briefer's forecast for the weather before 9 p.m. accurately sum-marized the information available to the briefer. The Charlottesville observations essentially confirmed the information Mr. Bradley gave to Mr. Peters. The briefer's failure to convey the Charlottesville reports was not a substantial factor in causing the crash.

28. Mr. Bradley did not read to Mr. Peters an area forecast transmitted by the National Weather Service at 7:40 A.M. and amended at 12:15 P.M. This forecast predicted ceilings at or below 1000 feet with visibility at or below three miles for mountainous sections of Virginia, West Virginia, North Carolina, South Carolina and remainders of Maryland and the District of Columbia.

29. While still valid, the area forecast was approximately six hours old. Mr. Bradley gave decedent forecasts which were more recent and more specific to the area of Mr. Peters' flight. Moreover, the briefer's forecast for after 9 p.m. was substantially the same as the area forecast. The briefer's failure to convey the area forecast was not a substantial factor in causing the crash.

30. Mr. Peters knew that weather conditions before 9 p.m. would be marginal VFR and after 9 p.m. would be IFR. Every student pilot receives some instruction in analyzing weather. Mr. Peters, an experienced pilot, should have known that predictions of when bad weather will occur are often inaccurate. Despite this, Mr. Peters interrupted Mr. Bradley more than once and cut short the briefing. Decedent wanted specific answers to his questions. He did not allow Mr. Bradley to give him a complete briefing.

31. Plaintiff has not met her burden of showing negligence in Mr. Bradley's pre-flight briefing. While recognizing that the weather briefing could have been more detailed, the information provided was adequate to put Mr. Peters on notice that conditions were marginal and were likely to deteriorate.

32. Mr. Bradley's briefing of Mr. Peters was not the proximate cause of the accident.

33. Mr. Peters departed from the College Park, Maryland airport, northeast of Washington, D.C., shortly after 6:09 P.M.

34. The first known contact by Mr. Peters with an FAA facility was at 7:04 P.M. EST. At that time, Mr. Peters contacted the Charlottesville Airport Control Tower, a facility without equipment to locate aircraft by radar.

35. Mr. Peters communicated with Mr. William Maki, an Air Traffic Controller who was at the Charlottesville Tower's "local control position." During the time Mr. Peters and Mr. Maki were in radio communications, Mr. Maki was also engaged in separating IFR aircraft within five miles of the control tower.

36. At 7:04:51, decedent told Mr. Maki that "the weather is doing worse than predicted." He then said: "We're VFR uh how's that Charlottesville visibility look to you on the ground." Although the weather had deteriorated, Mr. Peters was still in VFR conditions at that time.

37. After assisting a Piedmont aircraft on an instrument approach, Mr. Maki responded at 7:05:08 to decedent's request. He told Mr. Peters that visibility at the airport was six miles and that there was a measured ceiling of one thousand feet. Mr. Maki then gave Mr. Peters a safety advisory that the ridges to the east were possibly totally obscured and that the highest obstruction was at eighteen hundred and thirty feet.

38. The decedent knew or should have known that a one foot drop in the ceiling would have created IFR conditions at Charlottesville Airport. He also knew or should have known that conditions were likely to deteriorate further.

39. When the ceiling is reported as overcast, it means that more than nine-tenths of the sky is covered with clouds. A reasonable pilot should have understood Mr. Maki's information to mean that he could not land at Charlottesville without flying through instrument conditions.

40. Mr. Maki was not negligent for failing to report that there was fog in all quadrants around the airport. This would not have added substantially to the adverse weather information the controller had already conveyed. The failure to convey that specific information was not a substantial factor in causing the accident.

41. Mr. Maki asked decedent at 7:05:59 what his intentions were. Mr. Peters responded that he was going to "climb and look for a hole to come down V.F.R."

42. At 7:06:11, Mr. Maki asked decedent whether he was IFR qualified.

43. After Mr. Peters responded in the negative, Mr. Maki asked if he was "on top," *i.e.*, above the overcast.

44. Mr. Peters stated that his altitude was twenty-five hundred feet and he was "kind of weaving through scattered layers." At this point, Mr. Peters had not indicated that he was unable to maintain VFR conditions.

45. At 7:06:26, Mr. Maki asked the decedent if he was over the Gordonsville VOR. Mr. Peters responded that he was about five miles Northeast of Gordonsville VOR.

46. Mr. Peters could not have been at the position he reported. Given the airplane's cruising speed, decedent could not have travelled from five miles northeast of the Gordonsville VOR to the crash site by the time of the crash.

47. At 7:06:43, Mr. Maki asked Mr. Peters if his aircraft was equipped with a transponder. A transponder is equipment which can assist a radar facility in locating and identifying an airplane.

48. At 7:07:17, Mr. Peters responded that he was transponder-equipped. He then stated: "We're getting into some IFR so, ah, I think we're going to have to see if we can get Washington Center and ah retreat towards D.C. or some better ah VFR weather."

49. This was the first indication to Mr. Maki that Mr. Peters could no longer maintain VFR conditions.

50. At the time of this communication, Mr. Peters was still proceeding south.

51. Mr. Peters statement that he was "getting into some IFR" indicated that he had entered IFR conditions, violating federal regulations for a VFR pilot.

52. Mr. Peters had control of his aircraft when he entered IFR conditions.

53. Mr. Peters could have turned back toward Washington before requesting a frequency for contacting Washington Center and should have turned back before entering IFR conditions.

54. Mr. Peters' request for a frequency at 7:07:17 took approximately ten seconds to transmit. At 7:07:29 Mr. Maki told decedent that he would call Washington Center in order to obtain a radio frequency for Mr. Peters. Mr. Peters thanked Mr. Maki at 7:07:34. Four seconds later, communication was established between Charlottesville Tower and Washington Center. Mr. Peters' request for a frequency was relayed.

55. At 7:07:39, a Piedmont Airliner informed Mr. Peters that conditions around Charlottesville were "solid instruments."

56. Mr. Peters thanked the Piedmont pilot for the information at forty-six seconds past 7:07 p.m. This was the last communication from Mr. Peters.

57. At 7:08:05 Charlottesville Tower asked Mr. Peters about his fuel supply. There was no response. N7650D crashed near Locust Grove, Virginia between 7:07:50 p.m. and 7:08:10 p.m.

58. Both parties have stipulated that the cause of the crash was spatial disorientation. Spatial disorientation is a physiological and psychological condition which can occur in flight conditions when there is no visual reference to earth, sun, and stars. Spatial disorientation, even for a short period of time, can render a pilot incapable of controlling his aircraft. Mr. Peters suffered spatial disorientation by flying into instrument conditions. Before flying into instrument conditions, a pilot exercising reasonable care for his own safety would have turned back to the Washington, D.C. area.

■ 59. It was not negligent for the Charlottesville Tower to wait for Mr. Peters' request before contacting Washington Center to obtain a frequency. Mr. Peters never declared an emergency. Mr. Maki ascertained the decedent's situation, provided him with relevant safety and weather information, and assisted him in carrying out his intentions. The controller acted in a reasonable way under the circumstances.

60. There was an emergency when Mr. Peters notified the tower that he had penetrated IFR conditions. At that time, Charlottesville Tower acted quickly and efficiently in obtaining a radio frequency to allow Mr. Peters to contact Washington Center.

■ 61. Even if Mr. Maki had considered Mr. Peters' situation an emergency from the decedent's first contact, the air traffic controller acted at all times in accordance with Air Traffic Control Manual 7110.65A in dealing with the situation.

62. Mr. Maki's conduct was not a substantial factor in causing Mr. Peters' accident.

63. Mr. Peters noticed that the weather enroute was worse than predicted and knew or should have known that conditions were likely to deteriorate.

64. Plaintiff's principal expert witness exaggerated both his qualifications and his substantive testimony that "once he [Mr. Peters] departed, he is dead." His qualifications as a pilot expert are doubtful. His testimony about the significance of Mr. Bradley's briefing failed to recognize a pilot's responsibility for his own safety.

65. Defendant's expert witnesses were believable.

66. By rushing the weather briefing, failing to retreat to the Washington area when he knew that the weather was worse than predicted, looking for a hole to come down in the clouds at Charlottesville, and

flying in instrument conditions without having an IFR rating, Mr. Peters did not act with reasonable care for his own safety.

67. Mr. Peters' own negligence was a substantial factor in causing accident.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and subject matter of this dispute.

2. Venue for this action lies in the Eastern District of Pennsylvania.

3. This action was brought pursuant to the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 2671, *et seq.*

4. Under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b) and 2671 *et seq.*, the law of the place where the alleged act or omission occurred is applicable. In this case, the Virginia law on negligence and contributory negligence applies.

5. In Virginia, the ordinary rules of negligence and due care apply in aviation cases. *Mackey v. Miller*, 221 Va. 715, 273 S.E.2d 550 (1981).

6. Virginia law defines proximate cause as that act or omission which in natural and continuous sequence, unbroken by an efficient, intervening cause, produces the event and without which the event would not have occurred. *Wells v. Whitaker*, 207 Va. 616, 151 S.E.2d 422 (1966).

7. In order for negligence to be a proximate cause of an injury, it is not necessary for a defendant to foresee the precise injury; it is sufficient if an ordinary, careful, prudent person ought, under the circumstances, to have foreseen that an injury might probably result from his negligence. *Sawyer v. United States*, 465 F.Supp. 282 (E.D.Va.1978).

8. Under Virginia law, contributory negligence is a bar to recovery. *Mackey v. Miller*, 221 Va. 715, 273 S.E.2d 550 (1981). The plaintiff's negligence will not bar his recovery if it contributed only slightly or trivially to his injury or was a remote cause of injury. To bar recovery, plaintiff's negligence must be a substantial factor in causing his injury. *Simpson v. Lambert Brothers Division—Vulcan Materials Co.*, 362 F.2d 731 (4th Cir.1966). Satisfaction of the "but for" test is not sufficient. *Id.*

9. The defendant has the burden of proving contributory negligence by a preponderance of the evidence. *Washington v. Schuyler*, 433 F.2d 362 (4th Cir. 1970). Virginia law presumes that an injured party exercised ordinary care for his own safety. *Elkins v. United States*, 429 F.2d 297 (4th Cir.1970).

10. The test for contributory negligence in Virginia is whether the plaintiff, in the exercise of reasonable care, should have known he was in a situation of peril. *Reed v. Carlyle and Martin, Inc.*, 214 Va. 592, 202 S.E.2d 874, *cert. denied*, 419 U.S. 859, 95 S.Ct. 108, 42 L.Ed.2d 93 (1974). Mr. Peters should have known he was entering IFR conditions and turned back.

11. Under Virginia law, contributory negligence in responding to danger is not a bar where the cause of the accident was that defendant failed to warn plaintiff of the danger in question or gave an insufficient warning in breach of a duty. *Briggs v. Zotos International, Inc.*, 357 F.Supp. 89 (E.D.Va.1973); *Spruill v. Boyle-Midway, Inc.*, 308 F.2d 79 (4th Cir. 1962). In this case, however, Mr. Bradley's weather briefing was sufficient to warn the plaintiff of the likelihood of bad weather.

12. Michael Peters, the pilot, had responsibility for the operation of his aircraft. 14 C.F.R. § 91.3; *Spaulding v. United States*, 455 F.2d 222 (9th Cir.1972).

13. When the weather began to deteriorate, Mr. Peters knew or should have known that he would encounter IFR conditions. A pilot "cannot ignore the weather information he has been given or disregard the weather conditions he sees around him." *Spaulding v. United States*, 455 F.2d at 227. The decedent's "penetration into the clouds knowing that he could not navigate visually within them was as

imprudent an act as diving into mid-ocean without knowing how to swim...." *Black v. United States,* 441 F.2d 741, 745 (5th Cir.1971).

14. Michael Peters was negligent in not allowing the FSS briefer to finish his presentation and in failing to execute a 180 degree turn when the weather began to deteriorate.

15. If a VFR pilot is in control of his aircraft, it is negligent for him to operate his aircraft in instrument weather conditions. 14 C.F.R. § 61.3; *Gatenby v. Altoona Aviation Corp.,* 407 F.2d 443 (3d Cir.1968); *Travelers Insurance Co. v. Riggs,* 671 F.2d 810 (4th Cir.1982). Mr. Peters was in control of N7650D when he entered IFR weather. His violation of 14 C.F.R. § 61.3 constituted negligence.

15A. Michael Peters' negligent acts were the sole proximate cause of the crash of N7650D.

16. Marquette Bradley's weather briefing was not negligent. Mr. Peters was in a hurry, interrupted the briefing and terminated the conversation before Mr. Bradley could finish his presentation.

17. Mr. Bradley gave sufficient weather information to Mr. Peters. Mr. Bradley's briefing was not a substantial factor in causing Mr. Peters' accident.

18. William Maki acted in accordance with the provisions of the FAA's Air Traffic Controllers' Handbook.

19. "No duty is imposed upon controllers to warn pilots not to enter IFR weather conditions without a clearance, nor are they required to foresee or anticipate the unlawful or negligent ... acts of pilots." *Baker v. United States,* 417 F.Supp. 471, 488 (W.D.Wash.1975).

20. William Maki gave sufficient information about the weather conditions at Charlottesville Airport to decedent.

21. Mr. Maki did not delay in providing assistance for Mr. Peters. While engaged in his duty of separating IFR aircraft within five miles of the Charlottesville Airport, Mr. Maki responded quickly and efficiently to Mr. Peters' requests. Mr. Peters had final responsibility for operating his aircraft. 14 C.F.R. § 91.3; *Spaulding v. U.S.,* 455 F.2d 222 (9th Cir.1972). William Maki was not negligent and his conduct was not a substantial factor in causing Mr. Peters' accident.

## DISCUSSION

This suit on behalf of the estate of the pilot of a small plane seeks damages against the United States for the negligence of its employees. The plaintiffs claim that FAA personnel failed to use due care in providing a pre-flight weather briefing and in communicating with the pilot shortly before the crash. Virginia law applies and would bar the claim if the pilot's contributory negligence was a substantial factor in causing his accident. I find that the weather briefing was adequate under the circumstances, that the handling of the flight by the air traffic controller before the crash was diligent and that the cause of the crash was the pilot's own negligence in flying into bad weather instead of turning around.

On November 25, 1979 between 6:07 P.M. and 6:09 P.M. the weather briefer in a Virginia Flight Service Station gave the pilot information by telephone that the weather conditions for flying from the Washington, D.C. area to Lynchburg, Virginia were marginal for visual (VFR), as opposed to instrument (IFR) flying conditions. This pilot was not qualified for instrument flying. The forecast was that the marginal weather conditions would worsen after 9 P.M. The pilot's reply was, "o'boy I think we'd better get down there quick." The briefer's forecast of marginal conditions at Lynchburg before 9 P.M. (a ceiling of three thousand feet broken with clouds, occasional visibility of 3 miles, light rain showers) was an accurate summary of the information available to the weather briefer. The Charlottesville weather observations which were not given to the pilot essentially repeated the gist of the information conveyed that pre-9 P.M. flying conditions were marginal. The 1200 foot ceil-

ing reported at Charlottesville was still above the 1000 foot minimum for visual flight. The multi-state area forecast was more general and less recent than the specific information given. In addition, the briefer's forecast for worsening conditions after 9 P.M. covered the same substance as the area forecast. The pilot interrupted and cut short the weather briefer in his hurry. The briefer's failure to convey the Charlottesville and multi-state area reports was not a substantial factor in causing the crash.

The pilot's next communication was with the Charlottesville, Virginia air traffic control tower between approximately 7:04 and 7:07 P.M. The air traffic controller gave the pilot prompt and timely weather and safety information. He acted quickly and efficiently to put the plane into radar contact with the District of Columbia area. The tower told the pilot that the ceiling at Charlottesville was 1000 feet overcast within 15 seconds after the pilot asked for Charlottesville visibility. A reasonable pilot would understand this to mean he could not land. Additional information that there was "fog in all quadrants" would not have added substantially to the adverse weather information conveyed. The failure to convey additional information was not a substantial factor in causing the accident.

At approximately 7:08 P.M., the pilot, spatially disoriented from flying in the clouds, dove nose first into the ground. The pilot did not act with reasonable care for his own safety under the circumstances. He rushed the weather briefing, failed to retreat to the Washington area when he knew that the weather was worse than predicted, and flew into IFR weather conditions without having instrument capability.

Plaintiff's principal expert witness exaggerated both his qualifications and his substantive testimony that "once he [Mr. Peters] departed, he is dead." His qualifications as a pilot expert are doubtful. His testimony about the significance of the weather briefing failed to recognize a pilot's responsibility to exercise reasonable care for his own safety when he is told that weather conditions for flying to his destination are marginal and·expected to deteriorate.

Defendant's expert witnesses were believable. While recognizing that the weather briefing could have been more detailed, the information provided was adequate for VFR flight. The pilot was trying to beat the weather and was operating in conditions in which he was not qualified to fly. The pilot's own negligence was a substantial factor in causing the accident.