Ruth Henderson MOORHEAD, et al.,

v.

MITSUBISHI AIRCRAFT INTERNATIONAL, INC., et al.

Lynda M. HUTCHINSON, et al.,

v.

UNITED STATES of America, et al.

Rose Marie Baker McNEILL, et al.,

v.

MITSUBISHI AIRCRAFT INTERNATIONAL, INC., et al.

Nos. M–81–127–CA, M–83–65–CA and M–83–140–CA.

United States District Court, E.D. Texas, Marshall Division.

June 19, 1986.

Doyle Curry, Scott Baldwin, Jones, Jones, Baldwin, Curry & Roth, Marshall, Tex., for the Moorhead plaintiffs.

Tom Davis, Austin, Tex., Harry L. Cashin, Jr., Cashin & Davis, Atlanta, Ga., for the Hutchinson plaintiffs.

Robert J. Malone, Larry Boyd, Houston, Tex., for the McNeill plaintiffs.

L.S. Carsey, Fulbright & Jaworski, Houston, Tex., Duncan Fraser, Condon & Forsyth, New York City, for defendant Mitsubishi.

Jan Von Flatern, Emily M. Trapnell, Federal Aviation Admin., Washington, D.C., Robert Wortham, U.S. Atty., William Cornelius, Asst. U.S. Atty., Tyler, Tex., for defendant U.S. of America.

L.W. Anderson, Dallas, Tex., for defendant Baker Estate and intervenor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

STEGER, District Judge.

On February 18–21, 1985, came on for trial before the Court, without a jury, the above entitled and numbered consolidated cases and the Court having now heard all testimony presented by the respective parties and having considered all other evidence and exhibits admitted, hereby enters its Findings of Fact and Conclusions of Law in this cause in conformity with Federal Rule of Civil Procedure 52. Any finding of fact which constitutes a conclusion of law shall be deemed a conclusion of law and any conclusion of law which constitutes a finding of fact shall be deemed a finding of fact.

## I. STATEMENT OF THE CASE

On September 2, 1981, a Mitsubishi MU–2B–25 aircraft [1] crashed near McLeod, Texas, killing the five occupants of the plane. The survivors of those five occupants filed these three consolidated actions, seeking wrongful death damages from three defendants. After careful consideration of the evidence, this Court has concluded that two of these three defendants, the plane's pilot and the plane's manufacturer, are responsible for the crash. The plaintiffs and defendants may be categorized as follows:

1. *The Hutchinson Plaintiffs.* Three of the plane's occupants, James A. Hutchinson (decedent of Lynda M. Hutchinson), William R. "Bob" Hutchinson (decedent of Ruth P. Hutchinson), and Thomas L. Hutchinson (decedent of Carol H. House), were brothers who together operated Brigadier Industries, a family-owned mobile home manufacturer with eight plants and annual revenues of eighty-five million dollars. In addition to Brigadier Industries, each brother was involved in other profitable business ventures. The Hutchinson plaintiffs are comprised of the mother, wives, and children of the three brothers. All were residents of the state of Georgia at the time suit was filed.

2. *The Moorhead Plaintiffs.* A fourth passenger on the plane, Harold Brinson Moorhead (decedent of Ruth Henderson Moorhead), was the attorney for Brigadier Industries and the Hutchinson family. The Moorhead plaintiffs are comprised of the parents, wife, and children of Harold Brinson Moorhead. None were permanent residents of the state of Texas at the time this suit was filed.

3. *The Baker-McNeill Plaintiffs.* The fifth occupant of the plane, Raymond Dean Baker (decedent of Rose Marie Baker McNeill) was the plane's pilot. In addition to work as a corporate pilot, Raymond Baker also owned and operated a construction business. The Baker-McNeill plaintiffs consist of his wife and his three children.

None were residents of the state of Texas at the time their complaint was filed.

4. *Defendant Mitsubishi.* The aircraft involved in the crash was manufactured by Mitsubishi Aircraft International, Inc., a corporation organized and existing under Texas law. The plaintiffs alleged that the aircraft was defectively designed and unreasonably dangerous, and sought to prove Mitsubishi strictly liable for the crash. Just prior to the start of the trial, however, all three groups of plaintiffs settled with Mitsubishi. Mitsubishi remains a defendant in these findings and conclusions solely to determine the right to contribution or setoff of the remaining defendants.

5. *Defendant United States of America.* Charles Montoya, an Air Traffic Control Specialist at the Federal Aviation Administration's (FAA's) Dallas Flight Service Station, gave pilot Raymond Baker his preflight weather briefing. The plaintiffs maintain that Montoya negligently failed to warn Baker of potential icing conditions on his route of flight, a failure which plaintiffs allege proximately caused an encounter with ice and the ultimate crash. Damages are sought by all plaintiffs against the government pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* (FTCA).

6. *Defendant Raymond Baker.* The defendant United States argues that negligence on the pilot's part was the sole proximate cause or a new and independent cause of this crash, thereby rendering the weather briefer's omission of an icing forecast irrelevant for liability purposes. The pilot was also named as a defendant by the Hutchinson and Moorhead plaintiffs in amended complaints filed early in the fall of 1983, and by a cross-claim filed by Mitsubishi.

The relative liability of each of these three defendants is evaluated in the next section. Damages are then assessed in a separate section.

---

1. The MU–2B–25 is a twin-engine turboprop aircraft capable of carrying five to seven passengers, and has a certified service ceiling of 25,-000'. This particular aircraft bore the serial number 251 and was known in the air traffic system by its call sign, N233MA.

## II. LIABILITY

### A. Conclusions of Law

1. This Court has jurisdiction over the tort claims against the United States pursuant to 28 U.S.C. § 1346(b). This Court has jurisdiction over the remainder of the claims on the basis of the diversity of citizenship of the parties involved. 28 U.S.C. § 1332.

2. All jurisdictional prerequisites for a suit against the United States based on the Federal Tort Claims Act have been satisfied. 28 U.S.C. § 2675.

3. This cause of action arose as a result of a crash near McLeod, Texas, which is in the Marshall Division of the Eastern District of Texas. Venue is therefore proper in this Court. 28 U.S.C. § 1402(b) (proper venue for tort claims actions against the United States); 28 U.S.C. § 1391(a) (proper venue in diversity cases).

4. The Court must determine the liability of the United States. 28 U.S.C. § 2402. All other parties have waived any right to a trial by jury on issues unrelated to the government's liability.

5. Texas law governs the determination of all issues in this action.

a. Under the FTCA, federal district courts are to apply the law of the place where the act or omission giving rise to the government's liability occurred. 28 U.S.C. § 1346(b). This has been interpreted to include the whole law of the state where the cause of action arose, including that state's choice of law rules. *Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962); *Johnson v. United States*, 576 F.2d 606, 611 (5th Cir.1978). Since the crash occurred in Texas, the whole law of Texas applies to the claims against the government in this case.

b. As for the other defendants, in a diversity action the law of the state where the district court sits governs the substantive issues in the case. *Erie R.R. v. Tomp-*

kins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Syrie v. Knoll International*, 748 F.2d 304, 306 (5th Cir.1984) (applying Texas law in a products liability action). Again, this incorporates the whole law of the state, including its choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). This Texas district court must also apply the whole law of Texas to issues concerning the non-governmental defendants.

c. Texas has adopted the most significant relationship approach embodied in sections 6 and 145 of the Restatement (Second) of Conflict of Laws as the guide for making choice of law determinations in tort cases. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420 (Tex.1984); *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex.1979). In weighing the factors listed, trial courts are cautioned to conduct a qualitative rather than a quantitative analysis. *Gutierrez*, 583 S.W.2d at 319.

d. Application of section 145's list of contacts yields the following results in this case. The injury and the conduct causing the injury occurred in Texas and defendant Mitsubishi resides in Texas, but nearly all of the plaintiffs and defendant Baker resided in Georgia at the time of the crash. None of the plaintiffs had any relevant contractual relationships with any of the defendants. The choice then, appears to be between Texas law and Georgia law.[2]

e. Section 6's criteria provide the means for qualitatively weighing the contacts uncovered on section 145's list. The relevant policies of the competing forums are the most popular and often the most important of those criteria. *See* Restatement (Second) of Conflict of Laws, §§ 6(2)(b), (c) and (e). While Georgia has a legitimate interest in assuring that its citizens are adequately compensated for injuries they suffer, this is important only

---

**2.** The choice is an important one given the differences between Texas and Georgia law. For example, Georgia still follows the pecuniary loss rule in wrongful death cases, but apparently does not allow reductions for personal consumption expenses of the decedent. Ga.Code Ann. § 105–1301(1). Texas law is opposite on both counts.

when Georgia will be forced to bear the burden of providing for injured citizens who are inadequately compensated. On the other hand, Texas has a strong interest in preventing harmful acts of negligence from occurring within its boundaries. Texas also has a strong interest in deterring the design or use of unreasonably dangerously defective products in this state. Finally, Texas law will be easier to apply and better protects the expectations of the parties. For these reasons, Texas law will be employed to resolve all issues in this case. *See, e.g., Guillory on Behalf of Guillory v. United States,* 699 F.2d 781, 784–87 (5th Cir.1983).

■ 6. With regard to the claims asserted against the pilot and the government, the elements for actionable negligence in Texas are: (1) The existence of a duty on the part of one party to another; (2) a breach of that duty, and (3) an injury proximately caused by the breach of the duty. *Lucas v. Texas Industries, Inc.,* 696 S.W.2d 372, 276 (Tex.1984). *See also Brooks v. United States,* 695 F.2d 984, 987 (5th Cir.1983) (applying Texas negligence law in an FTCA case arising out of an airplane crash).

a. Proximate cause consists of two concepts: (1) cause in fact and (2) foreseeability. *Nixon v. Mr. Property Management Corp.,* 690 S.W.2d 546, 549 (Tex.1985).

■ (i) A breach of duty is a cause in fact of an injury if, in a natural and continuous sequence, unbroken by any new and independent cause, it produces the event resulting in injury (here, the crash of N233MA), and without this breach of duty, the injury would not have occurred. *McClure v. Allied Stores of Texas, Inc.,* 608 S.W.2d 901, 903 (Tex.1980). In this case, any breach of duty will be a cause in fact of the crash if the crash would not have occurred but for the breach.

■ (ii) The crash was foreseeable if a person possessing ordinary intelligence and using ordinary care would have anticipated that the crash, or some similar mishap, might reasonably result from the breach of

duty. *Mr. Property,* 690 S.W.2d at 550; *Rudes v. Gottschalk,* 324 S.W.2d 201, 207 (Tex.1959). The actor need only foresee an injury of the same general character as the actual injury, and need not anticipate the particular circumstances which occurred. *Williams v. Steves Industries, Inc.,* 699 S.W.2d 570, 575 (Tex.1985). The mere fact that this crash occurred, however, is no evidence that it was foreseeable. *Mashburn Trucking v. City of Fairfield,* 606 S.W.2d 44, 45 (Tex.Civ.App.—Waco 1980, no writ). Furthermore, the crash must have been the natural and probable result of the breach of duty. *Hot Spot Detectors, Inc. v. Farmers Supply Co.,* 401 S.W.2d 109, 112 (Tex.Civ.App.—Amarillo 1966, writ ref'd n.r.e.). Consequences which are possible, but are not normal, natural, or probable, are not foreseeable. *Thomas v. Magnolia Chemical Co. of Texas,* 394 S.W.2d 50, 56 (Tex.Civ.App.—Dallas 1965, writ ref'd n.r.e.) (fire started when one employee knocked a match out of another's hand and into gasoline; allowing smoking in the area was not a proximate cause); *Garrett v. Waits Bus Lines,* 229 S.W.2d 381, 383 (Tex.Civ.App.—Texarkana 1950, writ denied) (bus driver removed an intoxicated passenger who was then struck and killed by a passing motorist; not foreseeable).

■ b. The government contends that negligence on the part of the pilot was an intervening cause which severed any liability the government may have had. To be an intervening or new and independent cause, the pilot's negligence must have been unforeseeable, and it must have destroyed the causal connection between any breach of duty by the government's weather briefer and the crash of N233MA. *See, e.g. Texas Industries, Inc. v. Lucas,* 634 S.W.2d 748, 755 (Tex.App.—Houston (14th) 1982); *reversed on other grounds,* 696 S.W.2d 372 (Tex.1984); 1 State Bar of Texas, *Texas Pattern Jury Charges* PJC 2.03 (1970). In evaluating the government's contention, the first determination is whether the pilot's negligence was foreseeable. *Bell v. Campbell,* 434 S.W.2d 117, 120 (Tex.1968). If it was, it cannot be a

new and independent cause which would absolve the government. *Teer v. J. Weingarten, Inc.*, 426 S.W.2d 610, 614 (Tex.Civ. App.—Houston (14th) 1968, writ ref'd n.r. e.). If the pilot's negligence was unforeseeable, however, one of three scenarios would apply: Either the weather briefer's breach of duty, if any, was not a proximate cause; the pilot's negligence was an intervening cause; or the pilot's negligence was still merely a concurring cause. Either of the first two scenarios would absolve the government, while the last would make the government a joint tort-feasor. To satisfy the third scenario, the briefer must have breached a duty which proximately caused the crash, and the pilot's negligence must have concurred with the briefer's negligence to produce, in a continuous and unbroken sequence, the crash of N233MA. *See, e.g., Robert R. Walker, Inc. v. Burgdorf,* 150 Tex. 603, 244 S.W.2d 506, 510 (1951); *Batko v. Mecca Investment Co.,* 642 S.W.2d 41, 44 (Tex.App.—Eastland 1982, no writ).

■■■ c. The weather briefer's negligence, if any, also may have been merely a prior and remote cause, which would not give rise to governmental liability. In this instance, while the briefer's negligence, if any, may have furnished a condition which made the crash of N233MA possible, if the crash resulted from unforeseeable pilot negligence or product defect, the government would not be liable even though the crash would not have occurred but for the briefer's negligence. *See, e.g., Scurlock Oil Co. v. Birchfield,* 630 S.W.2d 674, 677 (Tex.App.—Houston (1st) 1981, no writ). The concept of prior and remote causation is akin to the concept of new and independent causation. For the latter, however, the focus is on the more recent cause. *Jack Williams Chevrolet, Inc. v. Bentley,* 505 S.W.2d 421, 425 (Tex.Civ.App.—Fort Worth 1974, no writ).

■■■ 7. With regard to the claims asserted against Mitsubishi, Texas law requires the plaintiffs to prove the following to establish a strict liability cause of action: (1) The product is defective; (2) the defect rendered the product unreasonably dangerous; (3) the product reached the consumer without substantial change in its condition from the time it was made and sold; and (4) the defective product was a producing cause of the plaintiff's injuries. *Syrie v. Knoll International,* 748 F.2d 304, 306 (5th Cir.1984) (Texas law). In this case, the plane manufactured by Mitsubishi is alleged to have been unreasonably dangerous because of a faulty Pitot system which would give a pilot a false air speed indication when frozen. As a general rule, a product is unreasonably dangerous when its usefulness does not outweigh the magnitude of the risk posed by its defect. A product defect is a "producing cause" of an injury if it was an efficient, exciting, or contributing cause, which in a natural and continuous sequence, in connection with any other cause or causes, produced the injury." *Shipp v. General Motors,* 750 F.2d 418, 425 (5th Cir.1985) (Texas law).

With these basic legal conclusions setting the parameters, the findings of this Court with regard to the cause of this crash follow.

## B. Findings of Fact

Each of the following findings of fact was made after careful consideration of the evidence, including credibility determinations as to testimony from witnesses. All evidence was weighed against the undisputed or stipulated facts in this case. As a result, those undisputed facts provide the best starting point.

### Undisputed Facts

1. At 2:25 p.m. on the afternoon of September 2, 1981, Raymond Baker telephoned the Dallas Flight Service Station to obtain a weather briefing for a flight to Augusta, Georgia via Texarkana, Texas; Greenwood, Mississippi; and Atlanta, Georgia.

2. The entire conversation between Raymond Baker and the Dallas Flight Service Station weather briefer lasted just over five minutes, was recorded, and has been transcribed verbatim. Since this

crash occurred before N233MA crossed the border between Texas and Louisiana, the question is whether Baker was adequately advised of pertinent weather conditions along his route of flight from Dallas to the Louisiana border.

3. With respect to Baker's route through Texas, the weather briefer failed to tell Baker about an area-wide forecast for moderate [3] mixed icing in clouds in precipitation above the freezing level. This forecast had been issued by the National Weather Service seven hours prior to the briefing. The area covered by the forecast included Oklahoma, New Mexico, Texas, and coastal waters.

4. During the first two minutes of the briefing Baker was advised no less than five times that most of the convective thundershower activity associated with a front which had passed through Texas would be to the south of his flight path. He was told, for example, that he would probably see "a mess of stuff" out of his right window as he headed east, but that "hopefully" he would be north of it.

5. Baker was told, however, that there was a chance of precipitation, in the form of rainshowers or thunderstorms, along the Texas portion of his flight. He was advised, for example, that there was "a lot of precip[itation] throughout the whole area," which apparently referred to the area around Texarkana, including the site of the crash. The briefer told him that the Gregg County, Texas vicinity was reporting two tenths coverage of thunderstorms and rainshowers. Baker was warned of the potential need to use his onboard weather radar to deviate around precipitation. By doing this, the briefer assured Baker that he could "probably get around most anything" he needed to avoid, and he added that at flight level 210 (21,000' mean sea level), which was Baker's proposed altitude, he would "probably be on top of most everything except the cirrus clouds."

6. Near the end of the briefing, Baker twice asked for and received confirmation of what had been told to him five times previously—that "most of the activity's to the south," but the briefer warned that he might "see the tail end of that front" in Texas and "the whole area has a chance of thundershower activity."

7. At approximately 3:58 p.m., nearly an hour and a half after the weather briefing ended, Baker radioed the Dallas Clearance Delivery Controller and received clearance to take N233MA from Dallas Love Field to Thomson, Georgia. The plane was cleared for takeoff at 4:13 p.m. The departure and climbout were normal, and at 4:23 p.m. Baker was cleared to climb and maintain flight level 210, approximately 21,000' above ground. At 4:41 p.m. Baker reported level at 21,000'.

8. An NTSB performance report later computed, among other things, the estimated actual air speed of N233MA after it leveled off at 21,000'.[4] While the specific numbers may not be exact, they are useful to detect a trend. The statistics indicate that after leveling off at 4:41 p.m., the plane gradually increased its velocity to near 200 knots, reaching this speed at approximately 4:46 p.m. The plane then began to rapidly lose velocity, declining to near 155 knots by 4:50 p.m.

9. At 4:50 Baker requested clearance to climb to 23,000'. He did not report any encounter with ice. He was immediately cleared to the higher altitude and began his ascent.

10. At just past 4:51 the plane reached its highest altitude—approximately 21,400' —and its slowest speed since takeoff— about 125 knots. The plane quickly began to descend, and a minute later had lost at least 3,000' in altitude. Radar contact was lost at 4:52 p.m.

---

**3.** There are four levels of icing intensity: trace, light, moderate, and severe. If the ice accumulation is moderate, even short encounters can be hazardous and the use of deicing equipment or course diversion is necessary.

**4.** Factual portions of the NTSB report are admissible. *Curry v. Chevron, U.S.A.,* 779 F.2d 272, 274 (5th Cir.1985); Federal Aviation Act of 1958, § 701(e), 49 U.S.C. § 1441(e).

11. Witnesses next observed the aircraft approximately 3,000' above the ground in a steep nose down attitude, spinning rapidly to the right as it fell out of the clouds and into their view. One witness stated that the nose of the aircraft was not bobbing up and down, but remained fixed "like an arrow." The aircraft struck the ground in a wooded area, and was destroyed by the force of the impact and an intense post-crash fire.

12. All potential causes of the crash were carefully considered and most were eliminated. The only remaining potential causes consist of the liability allegations against the three defendants in this case.

### No Governmental Negligence

Following Mitsubishi's settlement, the plaintiffs focused on the actions of the weather briefer as the primary cause of the crash. As an agent for the government, negligence on the briefer's part would result in governmental liability. After careful consideration, however, the Court does not believe the plaintiffs established the necessary prerequisites to a finding of negligence on the part of the weather briefer.

### No Breach of Duty

13. Weather briefers have a duty to provide pilots with accurate weather information. The weather briefer's handbook specifically requires them to give pilots information about hazardous weather conditions which might influence pilots to alter their proposed flight plans. Jerry Barron, a corporate pilot with over 9,000 hours in the air, testified that pilots depend on government weather briefings to obtain pertinent information. Even if the briefers' manual did not require them to disseminate information concerning hazardous conditions, such a duty arises from general pilot reliance on them for this service. *Gill v. United States*, 429 F.2d 1072, 1075 (5th Cir.1970). This duty also extends to passengers. *Pierce v. United States*, 679 F.2d 617, 621 (6th Cir.1982). The weather briefer in this case therefore owed a duty to Raymond Baker and the passengers on board N233MA.

14. Weather briefers, however, do not have a duty to warn pilots about hazards of which they should already be aware. *Davis v. United States*, 643 F.Supp. 67 (N.D.Ill.1986) ("A weather briefer need not point out what every pilot should know.").

15. Once warned about the possibility of encountering precipitation along his route in Texas, Baker knew or should have known there was a chance he also would encounter icing conditions. He should have known that at 21,000 feet, his proposed cruising altitude, he would be above the freezing level. He was an experienced pilot, trained to recognize hazardous weather conditions, including different types of clouds with varying degrees of icing potential. He knew that if he encountered precipitation in freezing temperatures, he could accumulate ice on his aircraft.

16. Once Baker was in the air, he could not rely on the failure of the briefer to mention the word "ice" in the weather briefing. When he reached 21,000 feet, his outside air temperature gauge, part of a pilot's normal instrument scan, would have confirmed the subfreezing temperatures outside his plane. All witnesses at trial, from meteorologists to pilots to FAA investigators, agreed that in clouds above the freezing level, there always is a potential for ice. Record at 101, 200, 553, 563, 577, and 651. When Baker saw ahead of him the cloud which was his ultimate demise, he knew he risked an icing encounter if he entered it, yet he chose to do so.

17. Since the briefer warned Baker about possible precipitation, Baker knew there was a chance for ice.[5] A forecast for possible moderate icing in clouds in precipitation which covered a huge, three-state

---

5. This is substantiated by the fact that examination of the wreckage indicated Baker had his engine air inlet heat on during his climb, demonstrating his awareness of a potential for ice. Record at 651.

area would have added nothing of consequence to this pilot's knowledge. The briefer had no duty to tell him what he already knew.

18. The briefer did not breach his duty to warn Baker about hazardous weather when he told Baker that most of the activity was to the south. When speaking to Baker, the briefer relied on numerous sources of information, including surface reports, winds aloft, pressure charts, surface analysis charts, radar summaries, and pilot reports from the area. *See Davis v. United States,* No. 81–C–3941 (N.D.Ill. Jan. 17, 1986). According to Joseph Beaudoin, an FAA employee, national weather service forecasts, such as the one containing the warning for ice in this case, were not considered pertinent or relevant at the time of this briefing. Record at 572–73. Instead, briefers were instructed to rely more heavily on the other sources of information available, especially pilot reports of actual encounters. Record at 576–77. Using this information, briefers are directed to interpret the weather, making sure to warn pilots about hazardous weather on their route. Record at 577.

19. Using all information available to him at the time, the briefer reasonably concluded that Baker would not encounter moderate icing, and that most of the activity associated with the front would be to the south. This conclusion was based in part on the fact that there were no pilot reports of anything greater than light icing in northeast Texas at the time of the briefing. Record at 576.[6] Warning of possible rain or thunderstorms in northeast Texas was sufficient to put Baker on notice of potential ice.

20. Meteorology is not an exact science. Weather forecasts fail on frequent occasions. *Brown v. United States,* 790 F.2d 199, 204 (1st Cir.1986) ("A weather forecast is a classic example of a prediction of indeterminate reliability ...."). Despite his

best efforts, it may be that this briefer's forecast failed. Pilots know about the uncertainties of meteorology, however. According to the testimony of Fredrick Hoerner, which this Court credits on this point, "[A pilot] can't depend that heavily on weather forecasts. You have got to go with what is happening now." Record at 558.

21. As suggested by the preceding finding, pilots bear the direct and primary responsibility for the operation of their aircraft. They have the final authority. *American Airlines, Inc. v. United States,* 418 F.2d 180, 191–92 (5th Cir. 1969). The weather briefer's forecast did not relieve Baker of his continuing duty to be aware of and react to what he saw with his own eyes. *Spaulding v. United States,* 455 F.2d 222, 226–27 (9th Cir.1972). A pilot cannot disregard the weather conditions he sees around him. *Id.* at 227; *Peters v. United States,* 596 F.Supp. 889, 895 (E.D.Pa.1984).

22. While recognizing that the briefing could have been more complete, when the briefer warned Baker about the possibility of encountering rain or thunderstorms in Texas, he gave Baker notice of a potential for ice sufficient to allow Baker to make an informed decision while still on the ground about whether he should go. *See also Peters,* 596 F.Supp. at 892. The failure to say the magic words "moderate icing," and the numerous assurances that *most,* but not all, of the weather would be to the south, did not constitute a breach of duty.

*Weather Briefing Was Not a Proximate Cause*

23. Even if the weather briefer's deficiencies in this case constituted a breach of duty, the weather briefing was not a proximate cause of this crash. In order to be a proximate cause, the briefing must have

---

**6.** Julian Andrew Hayes provided additional testimony concerning pilot reports of icing in northeast Texas, including another MU–2 that reported it was "icing up pretty good" at 19,000'. These reports came between 4:14 p.m. and 5:10

p.m. CDT, around the time of the crash. They would not have been available to the briefer at the time he spoke to Baker, more than two hours earlier.

been a cause in fact of the crash, and the crash must have been a foreseeable consequence of the briefing. Neither is the case.

24. In order to find that the crash would not have occurred but for the failure to convey accurate weather information, two facts must be established. First, since the briefer's alleged breach of duty involved a failure to warn Baker of adverse weather conditions along the Texas portion of his flight, weather conditions—specifically ice—must have been a cause of the crash. Second, it is necessary to find that had Baker received an adequate weather briefing, he would have evaded or managed the adverse weather, and therefore would have avoided the crash. While the Court believes ice played a role in this crash, the evidence on the second point was unconvincing.

*Ice Was an Actual Cause*

█ 25. After carefully weighing all the evidence on the issue, the Court believes plaintiffs proved that it was more likely than not that ice was a cause of this crash. Though useful only to test trends, the NTSB actual air speed data demonstrated an unmistakable rapid deceleration during the four minutes preceding Baker's request to ascend. There are only two ways to explain this deceleration: either Baker reduced power, or the plane collected ice, increasing its drag. Record at 626.

a. The reduction in power theory was espoused by Bernard J. Coogan, the government's pilot expert. As will be discussed further, Mr. Coogan correctly concluded that the Pitot tubes on N233MA froze, giving Baker a false indicated air speed. In an effort to blunt government liability, however, he unreasonably concluded that the pilot reduced power as a result of the false indicated air speed. According

to testimony from Richard Kemper, in order to account for the rapid deceleration trend reflected by the NTSB data, Baker would have had to substantially reduce his power. It is unreasonable to believe Baker would have drastically reduced power at 21,000′ (22,100′ mean sea level, less than 3,000′ below the plane's service ceiling), and then attempt to climb another 2,000′. The Court is unable to credit Mr. Coogan's testimony to this extent. Since a reduction in power does not reasonably explain the slowing trend, only an accumulation of ice can explain it.

b. Approaching the issue from a different direction leads to the same conclusion. The two most credible meteorologists who testified, Harold Taft and William Haggard, both concluded that N233MA was in the midst of saturated clouds with the capability of producing moderate icing. Both conceded that N233MA did not encounter any heavy rain, but convincingly testified that moderate icing can be produced even in clouds which are not producing precipitation detectable by radar.[7]

c. The conclusion that ice caused the deceleration and contributed to the crash, although already sufficiently established, was buttressed by the conclusions of Gregory Salottolo. Salottolo was the NTSB meteorologist who compiled factual data for the Board concerning the weather conditions at the time of the crash. *See supra* note 4. He was the only disinterested meteorologist who testified. He concluded that N233MA encountered moderate levels of ice.

*Weather Briefing Still Was*
*Not a Factor*

26. Even if the weather briefer had read the NWS forecast for moderate icing to Baker, he still would have gone. As

---

**7.** It is unclear whether the NWS forecast for moderate ice in clouds *in precipitation* would encompass ice encountered in moisture not detectable by radar. If not, Baker would not have been warned about what he actually encountered even if this forecast had been read to him. In any event, the Court cannot credit the testimony of Allen Pearson, the government's meteo-

rologist witness, to the extent he says it is impossible to accumulate moderate to severe icing without the presence of radar-detectable precipitation, but instead credits the contrary testimony from Taft and Haggard. Only such an accumulation of ice explains this crash, as also supported by the testimony of Fredrick Hoerner and Jerry Barron.

indicated in Liability Factual Finding Nos. 14–19, the briefing was adequate to put Baker on notice of the potential for ice. Reading the forecast would have added nothing to his actual knowledge. In addition, Baker knew he would have to cross a front somewhere in Mississippi and was specifically told he would encounter areas of hazardous weather in Alabama and Mississippi, yet he went. There were numerous pilots in other planes in the air that afternoon who received weather information from other briefers, some of whom probably did receive the icing forecast, yet they went.

27. A finding of liability cannot be based upon mere speculation or conjecture. *McCandless v. Beech Aircraft Corp.*, 779 F.2d 220, 223 (5th Cir.1985). Plaintiffs presented testimony proving that Baker was an extremely careful and cautious pilot. They did this in order to show he would probably not have gone that way that day. Yet it is equally plausible that his presumably careful and cautious nature would make it more likely he understood the implied risks of the rain and thunderstorms which the briefer said he might encounter. The plaintiffs failed to show a reasonable probability that Baker would have changed his flight plans if the briefer had said "the weather service is forecasting moderate icing in clouds in precipitation above the freezing level." As subsequent facts demonstrate, Baker's decision to enter the last cloud belies much less than care or caution, making it even more likely that he would not have changed his plans. Baker already knew he could encounter ice in clouds at flight level 210. *See also Davis v. United States*, 643 F.Supp. 67 (N.D.Ill.1986) ("[The pilot] might well have made up his mind to make the flight paying no attention to additional information.").

### No Foreseeability

28. Even assuming the briefing was an actual cause of the crash, neither the crash nor any similar mishap was foreseeable. In Texas, foreseeability is measured by common sense and common experience. *City of Bishop v. South Texas Electric Co-op*, 577 S.W.2d 331, 335 (Tex.Civ.App.— Corpus Christi 1979, no writ). Unless a crash was the natural and probable result of the briefer's omissions, there was no way to foresee it. *See supra* Liability Conclusion No. 6. This crash was not a natural and probable consequence for several reasons.

    a. The vast majority of icing encounters do not result in a crash. Other pilots have managed the amounts of ice which Baker apparently accumulated. *See, e.g.,* Record at 115, 458. Assuming the weather briefer could foresee an icing encounter by N233MA, the natural, normal, and probable result is a brief unpleasant experience and an ultimate return to safety. If the pilot reacts improperly, a crash is possible. Possibilities do not constitute foreseeability, however. *See supra* Liability Conclusion No. 6(a)(ii). The crash of N233MA was not in accordance with common experience, and was therefore unforeseeable.

    b. The pilot's negligence—his failure to react properly—caused this crash, as will be further discussed below. The possibility of his negligence also was not legally foreseeable. As a general rule of law, applied specifically in cases of this nature, government employees have no duty to anticipate pilot negligence. *Brooks v. United States*, 695 F.2d 984, 987 (5th Cir.1983) (a person is not bound to anticipate the negligent conduct of another under Texas law); *Colorado Flying Academy, Inc. v. United States*, 506 F.Supp. 1221, 1228 (D.Col.1981), *affirmed* 724 F.2d 871 (10th Cir.1984) (FAA employees are entitled to assume pilots will abide by regulations and are not required to foresee their negligence); *Baker v. United States*, 417 F.Supp. 471, 486 (W.D. Wash.1975) (same). Speculation on whether reading the forecast to Baker would have avoided the possibility of his negligence will not support a finding of proximate cause. *See, e.g. Lombard v. United States*, 601 F.Supp. 10, 13 (E.D.Mo.1984) ("It is not enough that the harm may not

have occurred had flight service station personnel taken additional measures of speculative value."). The weather briefing was not a proximate cause of this crash.

## Pilot Negligence

■ 29. As pilot in command of N233MA, Raymond Baker was directly responsible for, and was the final authority as to, the operation of that plane. *American Airlines, Inc. v. United States*, 418 F.2d at 192; 14 C.F.R. § 91.2 (1985). Baker therefore had a duty to protect his passenger's safety during the entire flight. Baker breached his duty in three respects, which together proximately caused this crash: (1) Baker should not have entered the cloud responsible for his icing encounter; (2) once in it, he waited too long before trying to get out of it; and (3) he mismanaged the flight controls after the plane stalled, and this mismanagement caused a spin from which the plane never recovered.

## An Imprudent Decision and a Delayed Reaction

30. Baker reported level at 21,000 feet at 4:41 p.m. His rapid deceleration, indicating an accumulation of ice, began five minutes later, at 4:46 p.m. Baker had been in and out of clouds during his climb, and was out of clouds at 4:41 p.m. when he reported at 21,000 feet. The clouds encountered during his climb gave him an accurate idea of cloud coverage. At 4:41, in an opening between clouds, he must have seen ahead of him the cloud which would occasion his encounter with ice, and must have seen that its top reached 23,000 feet. Record at 601.

31. At this point Baker could no longer rely solely on his weather briefing. He could not ignore the weather conditions he saw around him and ahead of him. *Spaulding*, 455 F.2d at 227. He knew he was above the freezing level, and knew that he could encounter ice in the cloud ahead of him. *See supra* Finding No. 16. He had four choices: deviate around the cloud, return to Dallas or some other airport, descend below the freezing level, or proceed into the cloud. Only the last alternative involved a risk of ice, and Baker knew this risk when he chose it.

32. The plane began to lose speed at 4:46, meaning ice had already accumulated to a dangerous level. The accumulation must have started prior to the time it reached the point of slowing the plane.

33. In a small plane like the MU–2, the pilot can easily see ice accumulating on his wings. At sometime shortly before 4:46 p.m., therefore, Baker knew he was picking up ice.

34. Only speculation exists concerning the actions Baker took during the first five minutes following his discovery of ice. Presumably he used his deicing boots, which under normal conditions will keep wings 90–95% free of ice. Record at 641. Perhaps the boots did not operate correctly, perhaps they were operated incorrectly by Baker, or perhaps ice on other leading edges accumulated too rapidly. Whatever the reason, the plane continued to lose velocity, proving it still was collecting ice.

35. The evidence conclusively established that at 4:50 p.m., Baker requested a climb. This is the only documented measure he took to escape the ice. It came four to five minutes after the icing started.

36. Under stress, with a mind racing, four to five minutes can seem like an eternity. During this time Baker could have descended or turned back, but he did neither. Presumably he relied on deicer boots all that time, despite seeing that ice was still accumulating on his plane.

## Mismanaged Stall

37. At 4:50 Baker was cleared to climb to 23,000 feet. He attempted the climb, but after one minute he had lost another 25 knots in actual air speed while climbing approximately 400'. The increased drag caused by ice on the plane had already increased its stall speed, and the slowing caused by the attempted climb pushed the

plane past that point. The plane experienced aerodynamic stall.[8]

38. The next minute contained a series of perhaps three stalls and recoveries in quick succession. As soon as the first stall occurred, Baker tried to begin a controlled descent in order to regain velocity and restore the necessary lift. He was not successful, and after this minute passed, the plane went into a spin from which it never recovered.

39. Only one of two scenarios can explain why N233MA went into a spin: either Baker misused the flight controls, or conditions were such that a spin was unavoidable. Based on a preponderance of the credible testimony, the Court believes it is more likely that the spin was caused by Baker's mishandling of the flight controls.

40. Bernard Coogan, a pilot with over 23,000 hours flying experience, convincingly testified that the ultimate spin had to be induced by pilot input.[9] Richard Kemper, a pilot with over 8,000 hours, concurred with Coogan and concluded that the spin was induced by misuse of the flight controls. According to Coogan, one of the most likely causes was Baker's inability to fully depress the rudder pedal, an essential spin recovery maneuver. Jerry Drennan, an instructor at Flight Safety International, testified that because of his short stature, Baker had trouble fully depressing the rudder. He advised Baker to place the seat in its full forward position and use a cushion. While it is likely that Baker was using a cushion on the day of the crash, Bernard Coogan's examination of the wreckage discovered that the pilot's seat was back several inches from the full forward setting, on the fourth notch.

*Breach of Duty and Causation*

41. Baker breached his duty as a pilot in three ways.

a. By proceeding into the cloud which produced his ice, he made a conscious decision to risk such an encounter rather than choosing another of his three alternatives. He placed N233MA in unnecessary peril, breaching his duty to protect the safety of his plane and his passengers. *See also Black v. United States*, 441 F.2d 741, 745 (5th Cir.) *cert. denied*, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971) (VFR pilot's decision to proceed into a storm created an unnecessary risk and constituted negligence); *Peters v. United States*, 596 F.Supp. at 895–6 (conscious decision to penetrate clouds constituted negligence).

b. By waiting four to five minutes before trying to escape from the cloud producing his ice, Baker placed his plane in even greater peril. His duty was to get his plane out of the ice as quickly as possible. His conscious decision to delay constituted an additional breach of duty. *See also Somlo v. United States*, 416 F.2d 640, 645 (7th Cir.1969) *cert. denied*, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970) (pilot's failure "to get his plane out of the air as soon as possible after first experiencing ice problems" constituted negligence); *Gatenby v. Altoona Aviation Corp.*, 407 F.2d 443, 447 (3d Cir.1968) (pilot's failure to turn back when poor conditions became apparent to him constituted negligence).

c. By failing to control the plane after it stalled, Baker committed his final breach of duty, and made his final contribution to the tragic result which quickly followed.

42. All three breaches of duty were actual causes of this crash. If Baker had chosen any alternative other than proceeding into the cloud, he could have avoided the ice. If he had reacted when he should have, he could have rescued the

---

8. Aerodynamic stall occurs when airflow over the wings is disrupted, preventing the lift necessary to sustain flight. The disruption will occur when the angle at which the wing meets the oncoming air is too great and the speed at which the wing meets the oncoming air is too slow.

9. Although Jerry Barron, a pilot with nearly 1300 hours in a MU–2, testified that icing conditions can be so severe that no pilot could handle the plane, he never said such conditions existed on this flight. In fact, Jerry Barron experienced an accumulation of ice in an MU–2 and was able to safely control the plane.

plane from the ice. If he had managed the stall, he could have avoided the resultant spin. Any of these three acts would have averted the crash.

■ 43. A crash was a foreseeable result of the pilot's breaches of duty. By deliberately flying into a potential icing situation, delaying for four to five minutes before trying to escape from accumulating ice, and then failing to properly manage a resultant stall, a crash was the normal, natural and probable result.

44. As an actual cause of a foreseeable result, the pilot's breaches of duty constituted a proximate cause of the crash of N233MA.

■ 45. Assuming for argument's sake that the weather briefer breached a duty which actually caused this crash, the pilot's negligence constituted an intervening cause which severs any governmental liability. The briefer could not foresee Baker's negligence. *See supra* Finding No. 28(b). The briefer's failure to repeat a forecast for icing and his statement that most of the weather was to the south did not contribute to Baker's decision two and one half hours later to proceed into an area he knew posed a risk of ice, his choice to stay there for four to five minutes after ice began to accumulate, and his mismanagement of a stall. The pilot's negligence created a new dangerous condition which broke any thread of causation tying the briefer to this crash. *See generally Scurlock Oil Co. v. Birchfield*, 630 S.W.2d at 677 (new dangerous condition eliminates liability from initial cause); *see also Black v. United States*, 441 F.2d at 745 (FAA employee's failure to warn two hours earlier did not contribute to decision to enter clouds).

■ 46. Assuming for the sake of argument that Baker would have changed his flight plans had the briefer given more information, the briefer's acts still constitute only a prior and remote cause. *See supra* Conclusion No. 6(c). The briefer's acts may have furnished a condition which made the crash possible, but since the crash was proximately caused by unforeseeable pilot negligence, no liability arises from the briefing.

*Corroboration of Pilot Negligence*

47. Although not necessary to the finding of pilot negligence, testimony concerning Baker's proficiency as a pilot of an MU–2 bolsters this conclusion. Carlos Albert Aguero, an instructor at Flight Safety International, conducted a recurrent training session with Baker on a simulator just two weeks prior to this crash. Aguero found Baker's knowledge of the MU–2 inadequate, his instrument flight rules skills insufficient, and recommended that Baker hire a professional co-pilot. Richard Kemper, the aviation expert called by Mitsubishi, confirmed Baker's inadequacies as an IFR pilot, and vouched for Flight Safety International's reputation. Record at 657–662.

48. As a result of Aguero's observations, Baker was not certified as successfully completing his refresher training. According to Charles Patrick, another employee at Flight Safety International, Baker was offered additional free time in order to successfully complete the course. This occurs with 7 to 8% of all pilots. To the best of Patrick's recollection, Raymond Baker is the only pilot to have ever refused the additional time. Record at 697.

*Product Defect*

49. As later facts demonstrate, the opening to the pressure tube in the Pitot system on N233MA froze just prior to the time the plane leveled off at flight level 210. The pressure inside the tube was trapped, and eventually equilibrated with the outside air pressure. As a result, the pressure inside the tube varied according to the outside air pressure, causing the plane's air speed indicator to function like an altimeter. At higher altitudes, with lower outside pressures, the indicated air speed would be higher. During level flight, with outside pressure constant, the indicated air speed also would remain constant regardless of the plane's actual

speed. In making this finding, the Court credits the testimony of Bernard Coogan.[10]

50. At approximately 4:46 p.m., the aircraft began to decelerate as a result of additional drag caused by accumulated ice. Because of the defective Pitot system, however, the pilot's indicated air speed gauge did not move. As a result, although Baker must have seen ice forming on his wings, and probably used his deicing equipment, he did not believe the ice was slowing his plane.

51. Raymond Baker requested a climb to 23,000′ at 4:50 p.m. At this time he had already lost almost fifty knots of velocity due to drag caused by the ice accumulating on his plane. Under these conditions, the safest course of action would have been a controlled descent. This would have allowed the plane to increase its velocity and, once below the freezing level (around 14,000′), shed the accumulated ice. According to Richard Kemper, if a pilot tries to climb rather than descend after losing speed, the plane will stall, and if the pilot does not manage the stall, the plane will go into a spin. Jerry Barron, an experienced pilot and a flight instructor, would have descended rather than tried to climb if he had been the pilot of N233MA. He instructs his students to establish a controlled descent to escape from icing conditions. This would have been an especially prudent decision for Baker since the MU–2, at flight level 230, would have been less than a thousand feet below its service ceiling, and according to Barron all general aviation aircraft experience a diminished ability to climb as they near their service ceiling, even when not in icing conditions.

52. The Court finds from a preponderance of the evidence that it is more likely than not that this crash would not have occurred had Baker descended at 4:51 p.m. rather than trying to climb. As such, the decision to climb was a producing cause, or cause in fact, of the crash.

53. Baker would not have attempted the climb if he had known his actual air speed had fallen from a high near 200 knots to approximately 150 knots in the four minutes preceding his request to climb. His indicated air speed gauge led him to falsely believe his plane had not yet lost any velocity, and so he believed he could execute the climb. If Baker had known his plane had lost so much velocity, he would have descended.[11]

54. Inadequate heating and poor location of the pressure tube rendered the Pitot system defective. Only minor changes would have alleviated most of the risk flowing from inaccurate air speed indications. As such, the defective Pitot system rendered the plane unreasonably dangerous.

55. The defective system, identified as the PH506, came with the plane when manufactured and sold. Maintenance records reflect the PH506 system was never repaired or replaced, making it more likely than not that it was in the same condition at the time of the crash as when it was made and sold.

56. The faulty Pitot system misled Baker, leading him to believe he could execute a climb. But for the Pitot system he would not have tried to climb, and but for the climb, he would not have stalled. As such, the defective product contributed to, and was a producing cause of, the crash of N233MA.

### Comparison of Causation

57. Based on a preponderance of the evidence, the Court finds that the three defendants caused the plaintiffs' injuries in the following proportions:

---

10. As previously noted the Court cannot credit Coogan's testimony also blaming the Pitot system for the plane's deceleration. The evidence overwhelmingly supports an encounter with ice as the cause of the deceleration trend.

11. This conclusion was made more credible by testimony from Coogan recounting the experiences of two pilots in a Boeing 727. Because of a frozen Pitot system, they relied on a false air speed gauge to their ultimate demise, despite the fact that to an outside observer this reliance was illogical and impossible.

United States of America      –0–
Mitsubishi Aircraft International, Inc.      40%
Raymond Dean Baker      60%

### III. DAMAGES

#### A. Findings of Fact and Conclusions of Law

1. Texas law governs the award of damages in this case. *See supra* Liability Conclusion of Law No. 5.

2. For the purpose of determining contribution and setoff rights among the three defendants, this Court must evaluate the defective product allegations against Mitsubishi despite Mitsubishi's settlement. Since this case was tried after July 13, 1983, and since it involves allegations of negligence and strict liability under Texas law, it is subject to the judicially-fashioned pure comparative causation analysis established in *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex.1984). Under this scheme, the Court must compare the causation of each defendant and state the comparisons in percentage terms. *Id.* at 427, n. 8. Mitsubishi's settlement with the plaintiffs will reduce the liability of the remaining non-settling defendants by the percentage of causation attributed to Mitsubishi. *Id.* at 430. By the same token, since the pilot is both defendant and plaintiff in this case, the recovery by the pilot as plaintiff also will be reduced by the percentage of causation attributed to the pilot as defendant. *Id.* at 429.

3. Under the Texas Survival Statute, statutory beneficiaries may recover for the decedent's conscious pain and suffering before death; funeral expenses; reasonable medical expenses incurred before death; and punitive damages. *See Stanford v. McLean Trucking Co.*, 506 F.Supp. 1252, 1255 (E.D.Tex.1981) (Parker, J.); Tex.Civ. Prac. & Rem.Code Ann. § 71.021 (Vernon 1986) (survival statute). Of these four items, punitive damages are not allowed against the government nor alleged against the pilot, and no medical expenses were incurred. The only evidence offered in support of an award for pain and suffering was either speculative or purely conjectu-

ral, and was therefore insufficient. *See Haley v. Pan American World Airways*, 746 F.2d 311, 316 (5th Cir.1984), *reh'g denied*, 751 F.2d 1258. The plaintiffs are entitled to recover funeral expenses.

4. Under the Texas Wrongful Death Act, statutory beneficiaries are entitled to recover pecuniary losses resulting from the decedent's death. Pecuniary losses consist of three separate categories:

a. The plaintiffs may recover the monetary value of the benefits they had a reasonable expectation of receiving from decedent had he lived, including primarily that portion of decedent's salary which would have been spent to support the plaintiffs. *City of Austin v. Selter*, 415 S.W.2d 489, 502 (Tex.Civ.App.—Austin 1967, writ ref'd n.r.e.).

b. Other intangible pecuniary contributions may also be recovered. These generally include loss of advice, counsel, services, care and, in the case of children, loss of nurture. *Id.* at 502.

c. Plaintiffs in Texas wrongful death cases may now also recover loss of inheritance damages as a component of their pecuniary loss. *Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630 (Tex.1986). Assuming Yowell applies to this case, plaintiffs failed to prove the probability that the decedents would have accumulated assets or that they probably would have left any accumulation by will or inheritance to the statutory beneficiaries. *Id.* at 632. The Court is unwilling to consider loss of inheritance as an element of damages in this case.

5. Texas has rejected the pecuniary loss rule and now allows any statutory beneficiary to also recover nonpecuniary losses in wrongful death cases. *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 551 (Tex.1985). Nonpecuniary losses consist of two separate elements:

a. Plaintiffs may recover for the loss of companionship, society, affection, solace, comfort, and assistance which the decedent would have provided to them. *Id.*

at 551. When the plaintiff is a spouse, he or she may also recover for loss of sexual relations, with the resulting element of damages being referred to as loss of consortium. *Whittlesey v. Miller*, 572 S.W.2d 665, 668 (Tex.1978). It is well settled that the surviving spouse may recover for loss of consortium in wrongful death cases. *Scurlock Oil Co. v. Smithwick*, 701 S.W.2d 4, 10 (Tex.App.—Corpus Christi 1985, no writ). This element of nonpecuniary loss is often mixed with the second element of pecuniary loss (loss of advice, counsel, services, care and nurture). *See, e.g. Missouri Pacific Railroad Co. v. Vlach*, 687 S.W.2d 414, 416 (Tex.App.—Houston [14] 1985, no writ) (recounting trial court's charge). For the sake of brevity, these two elements were combined into one in this case, and were labeled as "Loss of Consortium and Advice" as to the plaintiff spouses, "Loss of Companionship and Nurture" as to the minor plaintiffs, and "Loss of Companionship and Advice" for the remaining plaintiffs. All the factors listed for both elements were considered in assessing an award under this category.

b. Plaintiffs in Texas wrongful death actions may also recover for their mental anguish. *Cavnar*, 696 S.W.2d at 551. This element of nonpecuniary damages may be distinguished from the preceding element in that loss of companionship seeks to compensate for the loss of a broad range of mutual benefits enjoyed by families, while mental anguish damages address the grief caused by a family member's death. *Gulf State Utilities v. Reed*, 659 S.W.2d 849 (Tex.App.—Houston [14] 1983, writ ref'd

n.r.e.). Grief may subside; loss of companionship will not. *Air Florida, Inc. v. Zondler*, 683 S.W.2d 769, 772–73 (Tex.App.—Dallas 1984, no writ).

6. The Court is unable to award mental anguish damages to the plaintiffs in this case for two reasons.

a. In Texas, recovery for mental anguish still requires proof of some physical manifestation of grief. *Duncan v. Luke Johnson Ford, Inc.*, 603 S.W.2d 777, 778 (Tex.1980). Although the courts of appeal have divided on this issue after *Cavnar*,[12] this question does not require an *"Erie* guess" as to what the Texas Supreme Court would hold. Until altered, *Luke Johnson Ford* is the rule in Texas.[13] Plaintiffs presented no persuasive evidence proving any of them had physical manifestations of grief.

b. Since mental anguish and loss of companionship comprise separate items of recovery, independent proof is required to establish each. *Moore v. Lillebo*, 674 S.W.2d 474, 477 (Tex.App.—El Paso 1984, writ granted). The evidence admitted in this case was used to establish loss of companionship damages, and cannot also be used to support an award for mental anguish.[14]

7. With regard to the lost salary component of the pecuniary damages, the amount awarded was reduced to reflect the state and federal taxes each decedent would have paid. *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103

---

**12.** *Compare Brownsville Medical Center v. Gracia*, 704 S.W.2d 68, 80 (Tex.App.—Corpus Christi 1985, no writ) (requiring physical manifestation) and *Air Florida, Inc. v. Zondler*, 683 S.W.2d at 773 (same) with *Missouri Pacific Railroad Co. v. Vlach*, 687 S.W.2d at 417 (not required) and *Baptist Hospital of Southeast Texas, Inc. v. Baber*, 672 S.W.2d 296, 298–99 (Tex.App.—Beaumont, 1984, writ granted) (not required).

**13.** It is likely the Texas Supreme Court will decide the issue soon, since they have granted the writ in *Baber*.

**14.** These deficiencies in the plaintiff's proof may have been occasioned by the fact that *Cavnar* was decided after this trial was completed. By

its terms, *Cavnar* applies not only in future cases, but also wrongful death and survival cases "still in the judicial process" on June 5, 1985, which would include this case. 696 S.W.2d at 556. In *Cavnar*, however, the Texas Supreme Court refused to extend its opinion awarding prejudgment interest to the plaintiffs in that case because they failed at trial to request a distinct between past and future damages. As in *Cavnar*, the failure of plaintiffs in this trial to make the necessary distinctions deprives them of their right to mental anguish damages, even though they did not know the need at the time.

S.Ct. 2541, 2549, 76 L.Ed.2d 768 (1983); *Culver v. Slater Boat Co.*, 722 F.2d 114, 117 (5th Cir.) *cert. denied*, 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984). Based on a preponderance of the evidence, the amount deducted was 23.5% for Harold Brinson Moorhead, and due to their higher incomes, 30% for the Hutchinson plaintiffs.[15]

8. The lost salary component of the pecuniary damages was also reduced to reflect the sums which would have been expended for the decedents' personal needs and consumption. *See Culver*, 722 F.2d at 117 n. 3; *United States v. English*, 521 F.2d 63, 72 (9th Cir.1975). Based on a preponderance of the evidence, 30% was deducted for this purpose from the loss of support award for Thomas Hutchinson and James Hutchinson. For Harold Brinson Moorhead, 31% was deducted as per his beneficiaries' requested figure. For William R. Hutchinson, 35% was deducted because of his unusually expensive hobbies, such as collecting rare automobiles.

■ 9. In addition to the deductions just listed, the following formula was used to compute lost earnings. The Court started with the 1981 annualized salaries for each decedent, despite the marked increase in income for that year experienced by all four. Income from properties and investments was excluded since these continued to benefit the plaintiffs after the crash; only salary was considered. Following the method of calculation suggested by the Hutchinson plaintiffs, but using more appropriate figures based on a preponderance of the evidence, earnings were increased at the rate of 2% (1.5% for Jim and Bob Hutchinson) per year until age 55, were decreased at the same rate until age 65, then were decreased by one half and held constant at that rate until age 70. The rate of increase was lower for Jim and Bob Hutchinson because the unusually steep increase in income in 1981 indicated that they had already enjoyed the bulk of their bene-

fit from wage inflation. Personal consumption and tax deductions were made as a percentage of each year's salary, but continued to increase at the same rate (1.5% or 2%) after age 55. This created a shortfall between expenses and income after age 65 which was not considered by the Court. The resulting figures for each year were then reduced to present value beginning in 1987 at the rate of 0.75%, as stipulated by the parties. The values for this reduction were derived from Selby, *Standard Mathematical Tables* 640 (1969). Since the life expectancies of all survivors exceeded the life expectancy of the relevant decedents, earnings were computed to age 70 for all four of the victims.

10. The parents of decedent Moorhead were considered in awarding Loss of Companionship and Advice damages. No separate similar award was made for Gloria Hutchinson, mother of the Hutchinson decedents, since she had assigned all her claims to their widows and children. Her damages were included proportionally in their awards.

■ 11. No loss of support damages were awarded to any of the surviving adult children or the parents of decedent Moorhead. There was no evidence presented of any financial support received by these beneficiaries beyond the intangible pecuniary loss factors considered.

12. The loss of support damages for the two decedents who left minor children, Thomas and William "Bob" Hutchinson, were divided evenly between the children and the surviving spouse. The children's one half was then divided equally among the three.

■ 13. James A. Hutchinson and Henry W. Hutchinson are sons of decedent William "Bob" Hutchinson by prior marriages. Neither lived with his father. Their loss of companionship and nurture damages are therefore lower than those of their half brother, who was living with his

---

**15.** While Bob Hutchinson paid no taxes because his returns reflected he lost money, plaintiffs argue that he "really" made money. If he "really" made money then he "really" would have paid taxes.

father and his father's surviving spouse at the time of the crash.

14. The final figures obtained for all damages were reduced by 40% to reflect the causation of the settling defendant, Mitsubishi. This left the Baker plaintiffs with no recoverable damages, since all the remaining fault was placed on the pilot.

15. The following Damages Table lists the award for each item of compensable damages for each beneficiary. Loss of support damages were based upon the calculation formula described above. Loss of consortium or companionship and advice or nurture damages reflect a reasonable compensation based upon the preponderance of the evidence. The first number reflects the total award for each item, while the second number reflects the actual award after the reductions explained in the preceding finding.

16. Plaintiffs are entitled to prejudgment interest on past damages. *Cav-*

*nar,* 696 S.W.2d at 555. Interest begins to accrue from a date six months after the crash of N233MA, or approximately March 2, 1982. *Id.* No attempt was made to distinguish between past and future loss of companionship, consortium, advice and nurture damages, so no prejudgment interest calculation is possible. Prejudgment interest is calculable on those portions of the loss of support awards not reduced to present value. Those figures are listed parenthetically in the Damages Table, preceded by the acronym "SPJI" (Subject to Pre-Judgment Interest) and the relevant year. The rate of prejudgment interest shall be determined by reference to the Texas postjudgment interest statute. *Id.* at 554; Tex.Rev.Civ.Stat.Ann. art. 5069–1.-05 § 2 (Vernon Supp.1986).

17. Plaintiffs are entitled to post-judgment interest at the rate set by federal law. 28 U.S.C. § 1961(b). Plaintiffs shall also be entitled to recover their costs of court.

### B. Damages Table

Harold Brinson Moorhead (Decedent)
| | | | |
|---|---|---|---|
| Funeral Expenses | $ [1,493.00] | $ | 896.00 |

Ruth Henderson Moorhead
| | | |
|---|---|---|
| Loss of Support, Past and Future | [266,308.00] | 159,785.00 |
| (SPJI: 1982 | 46,410.00 | 27,846.00 |
| 1983 | 43,258.00 | 25,955.00 |
| 1984 | 40,125.00 | 24,075.00 |
| 1985 | 37,009.00 | 22,205.00 |
| 1986 | 33,909.00 | 20,345.00) |
| Loss of Consortium and Advice, Past and Future | [85,000.00] | 51,000.00 |

Suzanne Moorhead Wehrle (Age 39)
| | | |
|---|---|---|
| Loss of Companionship and Advice, Past and Future | [15,000.00] | 9,000.00 |

Donald R. Moorhead (Age 36)
| | | |
|---|---|---|
| Loss of Companionship and Advice, Past and Future | [15,000.00] | 9,000.00 |

Frederick W. Moorhead (Age 27)
| | | |
|---|---|---|
| Loss of Companionship and Advice, Past and Future | [15,000.00] | 9,000.00 |

S. R. Moorhead (Father)
| | | |
|---|---|---|
| Loss of Companionship and Advice, Past and Future | [10,000.00] | 6,000.00 |

Verna B. Moorhead  (Mother)

Loss of Companionship and Advice,
Past and Future .......... $  [10,000.00] ......... $   6,000.00

James A. Hutchinson   (Decedent)

Funeral Expenses .......... [4,706.00] ......... 2,824.00

Lynda Hutchinson

Loss of Support, Past and Future .......... [1,145,953.00] ......... 687,572.00

| | | |
|---|---|---|
| (SPJI: | 1982 | 42,000.00 | 25,200.00 |
| | 1983 | 42,630.00 | 25,578.00 |
| | 1984 | 43,270.00 | 25,962.00 |
| | 1985 | 43,919.00 | 26,351.00 |
| | 1986 | 44,577.00 | 26,746.00) |

Loss of Consortium and Advice,
Past and Future .......... [85,000.00] ......... 51,000.00

Thomas L. Hutchinson   (Decedent)

Funeral Expenses .......... [4,706.00] ......... 2,824.00

Carol Hutchinson House

Loss of Support, Past and Future .......... [957,898.00] ......... 574,739.00

| | | |
|---|---|---|
| (SPJI: | 1982 | 24,510.00 | 14,472.00 |
| | 1983 | 25,062.00 | 15,037.00 |
| | 1984 | 25,563.00 | 15,338.00 |
| | 1985 | 26,074.00 | 15,644.00 |
| | 1986 | 26,596.00 | 15,958.00) |

Loss of Consortium and Advice,
Past and Future .......... [175,000.00] ......... 105,000.00

Catherine Hutchinson (Age 10)

Loss of Support, Past and Future .......... [319,300.00] ......... 191,580.00

| | | |
|---|---|---|
| (SPJI: | 1982 | 8,190.00 | 4,914.00 |
| | 1983 | 8,354.00 | 5,012.00 |
| | 1984 | 8,521.00 | 5,113.00 |
| | 1985 | 8,691.00 | 5,215.00 |
| | 1986 | 8,865.00 | 5,319.00) |

Loss of Companionship and Nurture,
Past and Future .......... [85,000.00] ......... 51,000.00

Leigh Hutchinson (Age 7)

Loss of Support, Past and Future .......... [319,300.00] ......... 191,580.00

| | | |
|---|---|---|
| (SPJI: | 1982 | 8,190.00 | 4,914.00 |
| | 1983 | 8,354.00 | 5,012.00 |
| | 1984 | 8,521.00 | 5,113.00 |
| | 1985 | 8,691.00 | 5,215.00 |
| | 1986 | 8,865.00 | 5,319.00) |

Loss of Companionship and Nurture,
Past and Future .......... [85,000.00] ......... 51,000.00

Caroline Hutchinson (Age 4)

Loss of Support, Past and Future .......... [319,300.00] ......... 191,580.00

| | | | |
|---|---|---|---|
| (SPJI: | 1982 | $    8,190.00 | $    4,914.00 |
| | 1983 | 8,354.00 | 5,012.00 |
| | 1984 | 8,521.00 | 5,113.00 |
| | 1985 | 8,691.00 | 5,215.00 |
| | 1986 | 8,865.00 | 5,319.00) |

Loss of Companionship and Nurture,
Past and Future — [85,000.00] — 51,000.00

**William Robert Hutchinson (Decedent)**

Funeral Expenses — [4,227.00] — 2,536.00

**Ruth Hutchinson**

Loss of Support, Past and Future — [2,136,523.00] — 1,281,914.00

| | | | |
|---|---|---|---|
| (SPJI: | 1982 | 63,700.00 | 38,220.00 |
| | 1983 | 64,974.00 | 38,984.00 |
| | 1984 | 66,274.00 | 39,764.00 |
| | 1985 | 67,599.00 | 40,559.00 |
| | 1986 | 68,951.00 | 41,371.00) |

Loss of Consortium and Advice,
Past and Future — [175,000.00] — 105,000.00

**James A. "Trey" Hutchinson (Age 16)**

Loss of Support, Past and Future — [712,175.00] — 427,305.00

| | | | |
|---|---|---|---|
| (SPJI: | 1982 | 21,233.00 | 12,740.00 |
| | 1983 | 21,658.00 | 12,995.00 |
| | 1984 | 22,091.00 | 13,255.00 |
| | 1985 | 22,533.00 | 13,520.00 |
| | 1986 | 22,984.00 | 13,790.00) |

Loss of Companionship and Nurture,
Past and Future — [35,000.00] — 21,000.00

**Henry W. Hutchinson (Age 9)**

Loss of Support, Past and Future — [712,175.00] — 427,305.00

| | | | |
|---|---|---|---|
| (SPJI: | 1982 | 21,233.00 | 12,740.00 |
| | 1983 | 21,658.00 | 12,995.00 |
| | 1984 | 22,091.00 | 13,255.00 |
| | 1985 | 22,533.00 | 13,520.00 |
| | 1986 | 22,984.00 | 13,790.00) |

Loss of Companionship and Nurture,
Past and Future — [35,000.00] — 21,000.00

**William R. Hutchinson, Jr. (Age 6)**

Loss of Support, Past and Future — [712,175.00] — 427,305.00

| | | | |
|---|---|---|---|
| (SPJI: | 1982 | 21,233.00 | 12,740.00 |
| | 1983 | 21,658.00 | 12,995.00 |
| | 1984 | 22,091.00 | 13,255.00 |
| | 1985 | 22,533.00 | 13,520.00 |
| | 1986 | 22,984.00 | 13,790.00) |

Loss of Companionship and Nurture,
Past and Future — [85,000.00] — 51,000.00

TOTAL: — [$8,611,239.00] — $5,166,745.00

Judgment will be entered accordingly. It is so ORDERED.

## FINAL JUDGMENT ON REMAINING CLAIMS

These three consolidated cases were tried to the Court on February 18–21, 1985 in Marshall, Texas. The Court has this day signed its findings of fact and conclusions of law setting forth the basis for this judgment, and has directed entry of judgment in accordance with Rule 58 of the Federal Rules of Civil Procedure.

It is, therefore, ORDERED, ADJUDGED and DECREED:

1. That all claims for relief asserted by the PLAINTIFFS Ruth Henderson Moorhead, individually and on behalf of the estate of Harold Brinson Moorhead; Suzanne Moorhead Wehrle; Donald R. Moorhead; Frederick W. Moorhead; S.R. Moorhead; Verna B. Moorhead; Lynda Hutchinson, individually and on behalf of the estate of James A. Hutchinson; Carol Hutchinson House, individually and on behalf of the estate of Thomas L. Hutchinson, and as next friend for Catherine Hutchinson, Leigh Hutchinson, and Caroline Hutchinson; Ruth Hutchinson, individually and on behalf of the estate of William Robert Hutchinson, and as next friend for James A. Hutchinson, Henry W. Hutchinson, and William R. Hutchinson, Jr.; Rose Marie Baker McNeill, individually and on behalf of the estate of Raymond Baker; Charles Baker; Christine J. Baker; and Jana Baker Wood, against the DEFENDANT the United States of America are hereby DISMISSED with prejudice. These plaintiffs shall take nothing from this defendant.

2. That the PLAINTIFFS, Ruth Henderson Moorhead, individually and on behalf of the estate of Harold Brinson Moorhead; Suzanne Moorhead Wehrle; Donald R. Moorhead; Frederick W. Moorhead; S.R. Moorhead; Verna B. Moorhead; Lynda Hutchinson, individually and on behalf of the estate of James A. Hutchinson; Carol Hutchinson House, individually and on behalf of the estate of Thomas L. Hutchinson, and as next friend for Catherine Hutchinson, Leigh Hutchinson, and Caroline Hutchinson; and Ruth Hutchinson, individually and on behalf of the estate of William Robert Hutchinson, and as next friend for James A. Hutchinson, Henry W. Hutchinson, and William R. Hutchinson, Jr., have judgment against the DEFENDANT the estate of Raymond Baker in the amount of FIVE MILLION, ONE HUNDRED AND SIXTY–SIX THOUSAND, SEVEN HUNDRED AND FORTY–FIVE DOLLARS AND NO CENTS ($5,166,745.00), in the manner and to the degree set forth in this Court's Findings of Fact and Conclusions of Law of even date, together with prejudgment interest at the rate of ten percent (10%) per annum from March 2, 1982 to this date on the sums specified in this Court's Findings of Fact and Conclusions of Law of even date, and together with postjudgment interest at the rate of seven point zero three percent (7.03%) per annum from this date forward.

3. That all claims for relief asserted by all PLAINTIFFS against the DEFENDANT, Mitsubishi Aircraft International, Inc., have been previously settled or compromised and dismissed with prejudice, as reflected in part by the Final Judgment entered by this Court on April 19, 1985.

4. That all cross-claims, counterclaims, or other causes of action filed in these consolidated cases not specifically or implicitly disposed of above are hereby DISMISSED with prejudice.

It is further ORDERED, ADJUDGED and DECREED that the portions of the sum awarded allocated to minor plaintiffs, James A. Hutchinson, Henry W. Hutchinson, William R. Hutchinson, Catherine Hutchinson, Leigh Hutchinson, and Caroline Hutchinson, be held and invested by the Clerk of this Court and any successors in office for the use and benefit of said minor plaintiffs as a trust fund until minor plaintiffs reach majority, said portions to be invested in an interest bearing account at Interfirst Bank of Tyler, N.A., or until further order of the Court, at which time the Clerk will pay said portions in accord-

ance with court order, and when and if said portions have been paid into the registry of this Court, this judgment shall be fully satisfied, paid off and discharged insofar as said minor plaintiffs are concerned, and no execution shall issue hereon in favor of said minor plaintiffs.

It is further ORDERED that the defendant, the United States of America, recover its costs of action, and that the prevailing plaintiffs recover their costs of action from the defendant, the estate of Raymond Baker.